**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ALLIN FRAWLEY, on behalf of himself and all others similarly situated, | Civil Action No. |
| *Plaintiff*, | |
| v. | **CLASS ACTION COMPLAINT** |
| NEXSTAR MEDIA GROUP, INC. | |
| *Defendant*. | **JURY TRIAL DEMANDED** |

Plaintiff Allin Frawley, on behalf of himself and all others similarly situated, files this Complaint against Defendant Nexstar Media Group, Inc. ("Nexstar" or "Defendant") for violation of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"). Plaintiff's claims arise from Defendant's practice of knowingly disclosing to a third party, Meta Platforms, Inc. ("Facebook"), data containing its digital subscribers' (i) personally identifiable information or Facebook ID ("FID") and (ii) the computer file containing video and its corresponding URL viewed ("Video Media") (collectively, "Personal Viewing Information").[1] Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## I.    NATURE OF THE ACTION

1.    This is a consumer digital privacy class action complaint against Nexstar, as the owner of *The Hill*, for violating the VPPA by disclosing its digital subscribers' identities and Video Media to Facebook without the proper consent.

2.    The VPPA prohibits "video tape service providers," such as *The Hill*, from knowingly disclosing consumers' personally identifiable information, including "information which identifies a person as having requested or obtained specific video materials or services from a video tape provider," without express consent in a stand-alone consent form.

3.    Like other businesses with an online presence, Defendant collects and shares the personal information of visitors to its website and mobile application ("App") with third parties.

---

[1] Upon information and belief, Plaintiff believes Defendant may have stopped disclosing the information at issue to Facebook on or about March 31, 2022. However, even assuming Defendant did voluntarily cease its misconduct prior to the filing of this Complaint, Plaintiff and the proposed Class have already been injured and are entitled to damages. Moreover, absent the relief sought, Defendant could resume the same course of misconduct at any time.

Defendant does this through cookies, pixels, and Conversions API[2]. In other words, digital subscribers to *The Hill* have their personal information disclosed to Defendant's third-party business partners.

4.      The Facebook pixel is a code Defendant installed on its *The Hill* website allowing it to collect users' data. More specifically, it tracks when digital subscribers enter *TheHill.com* website or App and view Video Media. *The Hill* website tracks and discloses to Facebook the digital subscribers' viewed Video Media and, most notably, the digital subscribers' FID. This occurs even when the digital subscriber has not shared (nor consented to share) such information.

5.      Importantly, Defendant shares the Personal Viewing Information—*i.e.*, digital subscribers' unique FID and video content viewed—*together as one data point to Facebook*. Because the digital subscriber's FID uniquely identifies his or her Facebook user account, Facebook—or any other ordinary person—can use it to quickly and easily locate, access, and view the digital subscriber's corresponding Facebook profile. Put simply, the pixel allows Facebook to know what Video Media one of its subscribers viewed on *The Hill* site.

6.      Thus, without telling its digital subscribers, Defendant profits handsomely from its unauthorized disclosure of its digital subscribers' Personal Viewing Information to Facebook. It does so at the expense of its digital subscribers' privacy and their statutory rights under the VPPA.

7.      Because *The Hill* digital subscribers are not informed about this dissemination of their Personal Viewing Information – indeed, it is automatic and *invisible* – they cannot exercise

---

[2] "API" stands for Application Programming Interface and is a way for two or more computer programs to communicate with one another. According to Apple, its "Conversions API is designed to create a direct connection between your marketing data and the systems that help optimize ad targeting, decrease cost per result and measure outcomes across Meta technologies." *See* https://www.facebook.com/business/help/2041148702652965?id=818859032317965 (last accessed Feb. 20, 2023).

reasonable judgment to defend themselves against the highly personal ways *The Hill* has used and continues to use data it has about them to make money for itself.

8.      Defendant chose to disregard Plaintiff's and hundreds of thousands of other *The Hill* digital subscribers' statutorily protected privacy rights by releasing their sensitive data to Facebook. Accordingly, Plaintiff brings this class action for legal and equitable remedies to redress and put a stop to Defendant's practices of intentionally disclosing its digital subscribers' Personal Viewing Information to Facebook in knowing violation of VPPA.

## II.     JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the Video Privacy Protection Act, 18 U.S.C. § 2710.

10.     This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class (defined below) exceeds $5,000,000, and at least one member of the Class is a citizen of a state different from that of Defendant.

11.     Venue is appropriate in this District pursuant to 28 U.S.C. §1391 because Defendant does business in and is subject to personal jurisdiction in this District. Venue is also proper because a substantial part of the events or omissions giving rise to the claim occurred in or emanated from this District.

## III.    THE PARTIES

12.     Plaintiff Allin Frawley is an adult citizen of the Commonwealth of Massachusetts and is domiciled in the Commonwealth of Massachusetts. Plaintiff began his digital subscription to *The Hill* in 2019 and continues to maintain the subscription to this day. Throughout the same time period, he has maintained a Facebook account and has used his *The Hill* digital subscription to view Video Media through *The Hill* website and/or App while logged into his Facebook account.

By doing so, Plaintiff's Personal Viewing Information was disclosed to Facebook pursuant to the systematic process described herein. Plaintiff never gave Defendant express written consent to disclose his Personal Viewing Information.

13.     Defendant Nexstar Media Group, Inc. is a publicly traded American media company headquartered in Irving, Texas. It is the largest television station owner in the United States, owning 197 television stations across the U.S., most of which are affiliates with the four "major" U.S. television networks. Nexstar's annual revenue is $4.5 billion. In August 2021, Nexstar acquired *The Hill* for $130 million. *The Hill* is a digital media company based in Washington D.C. and the owner of *TheHill.com* website, the largest independent political news site in the U.S., and the second largest in online political news readership. *The Hill* website includes *TheHill.tv* which provides a broad selection of video content. *The Hill* had approximately 48 million average monthly users and 2.2 billion total pageviews in 2020. Further, *The Hill* generated 914 million video views on Twitter and garnered five times more Facebook interactions than other political news websites. Combined, Nexstar and *The Hill* are used by one third of all U.S. digital media viewers. As detailed below, through *The Hill* website and App, Defendant delivers and, indeed, is in the business of delivering, countless hours of video content to its digital subscribers.

## IV.     FACTUAL ALLEGATIONS

### A.     Background of the Video Privacy Protection Act

14.     The VPPA generally prohibits the knowing disclosure of a customer's video rental or sale records without the informed, written consent of the customer in a form "distinct and separate from any form setting forth other legal or financial obligations." Under the statute, the Court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief, and attorneys' fees.

15.     The VPPA was initially passed in 1988 for the explicit purpose of protecting the privacy of individuals' and their families' video rental, purchase, and viewing data. Leading up to its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." S. Rep. No. 100-599 at 7-8 (1988).

16.     Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

17.     In proposing the Video and Library Privacy Protection Act (later codified as the VPPA), Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988). Thus, the personal nature of such information, and the need to protect it from disclosure, is the inspiration of the statute: "[t]hese activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id*.

18.     While these statements rang true in 1988 when the VPPA was passed, the importance of legislation like the VPPA in the modern era of data mining from online activities is more pronounced than ever before. During a recent Senate Judiciary Committee meeting, "The

Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[3]

19.     In this case, Defendant chose to deprive Plaintiff and the Class members of that right by systematically disclosing their Personal Viewing Information to Facebook, without providing notice to (let alone obtaining consent from) anyone, as explained herein.

**B.**     ***The Hill's* Digital Subscriptions**

20.     To register for *The Hill*, users sign up for an online newsletter. *The Hill* users provide their personal information, including but not limited to their name, email address, and zip code.

21.     *The Hill* operates a website in the U.S. accessible from a desktop or mobile device at *TheHill.com*. It also offers an App available for download on Android and iPhone devices.

22.     On information and belief, all digital subscribers provide Defendant with their IP address, which is a unique number assigned to all information technology connected devices, that informs Defendant as to subscribers' city, zip code, and physical location.

23.     Digital subscribers may provide to Defendant the identifier on their mobile devices and/or cookies stored on their devices.

---

[3] The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, https://www.judiciary.senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century (last accessed February 20, 2023).

24.     When opening an account, Defendant does not disclose to its digital subscribers that it will share their Personal Viewing Information with third parties, such as Facebook. Digital subscribers are also not asked to consent to such information sharing upon opening an account.

25.     After becoming a digital subscriber, viewers have access to a variety of *The Hill* Video Media on Defendant's digital platform.

26.     Notably, once a digital subscriber signs in and watches *The Hill* Video Media, the digital subscriber is not provided with any notification that their Personal Viewing Information is being shared. Similarly, Defendant also fails to obtain digital subscribers' written consent to collect their Personal Viewing Information "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," as the VPPA requires.

**C.     Defendant Admits It Collects and Discloses Certain Personal Information of Digital Subscribers to Third Parties But Fails to Advise It Discloses Personal Viewing Information, as Required Under the VPPA.**

27.     The operative Privacy Policy for *The Hill* states that it collects "Personal Information" which it defines as Identifiable Information and Other Information.

> Identifiable Information may include but is not limited to: [user] name; physical address; phone number; e-mail address; and any combination of information that individually identifies [user]…Other Information may include but is not limited to information such as identifiers like [user] IP address, device ID and cookie ID as well as internet and connecting device information and other information.[4]

28.     *The Hill* discloses in its Privacy Policy that it automatically collects "information about [user] interactions with video content, such as the type of content viewed…"[5]

---

[4] *See* https://www.nexstar.tv/privacy-policy/ (last accessed February 20, 2023).

[5] *See id.*

29.     Importantly, nowhere in *The Hill*'s Terms of Service or Privacy Policy is it disclosed that Defendant will share digital subscribers' private and protected Personal Viewing Information with third parties, including Facebook.

**D.      How *The Hill* Disseminates Digital Subscribers' Personal Viewing Information**

30.     Defendant purposely installed the Pixel and Conversions API tool on its webpages and programmed them to surreptitiously share its subscribers' private and protected viewing history with Facebook.

31.     Defendant used these tools to its own benefit with the goal of increasing its profitability.

32.     In order to understand Defendant's unlawful data-sharing practices, it is important first to understand basic web design and tracking tools.

**1.      *Facebook's Business Tools and the Pixel*.**

33.     Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[6]

34.     In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Defendant, to utilizes its "Business Tools" to gather, identify, target, and market products and services to individuals.

35.     Facebook's Business Tools, including the Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers to record user activity on those platforms and transmit it to Facebook.

---

[6] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last accessed February 20, 2023)

36.     The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, that webpage's Universal Resource Locator ("URL") and metadata, button clicks, etc.[7] Advertisers, such as Defendant, can track other user actions and can create their own tracking parameters by building a "custom event." [8]

37.     One such Business Tool is the Pixel which "tracks the people and type of actions they take."[9] When a user accesses a webpage that is hosting the Pixel, their communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook's servers—traveling from the user's browser to Facebook's server.

38.     Notably, this transmission only occurs on webpages that contain the Pixel. Thus, Plaintiff's and Class Member's Private Information would not have been disclosed to Facebook via the Pixel but for Defendant's decisions to install the Pixel on its Website.

39.     Similarly, Plaintiff's and Class Member's Private Information would not have been disclosed to Facebook via Conversions API but for Defendant's decision to install and implement that tool.

---

[7] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142. (last accessed February 20, 2023); *see* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/ ; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142 (last accessed February 20, 2023); FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last accessed February 20, 2023).

[8] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (last accessed February 20, 2023); *see also* FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last accessed February 20, 2023).

[9] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting (last accessed February 20, 2023).

40.     By installing and implementing both tools, Defendant caused Plaintiff's and Class Member's viewing history to be transmitted to Facebook via the Pixel, and it caused a second improper disclosure of that information via Conversions API.

41.     As explained below, these unlawful transmissions are initiated by Defendant's source code as Plaintiff's and Class Member's request or view videos via *TheHill.com*.

**2.      *How the Tracking Pixel and/or Conversions API is Used to Transmit Personal Viewing Information (i.e., the interplay between HTTP Requests and Responses, Source Code, and the Pixel).***

42.     Web browsers are software applications that allow consumers to navigate websites and access web content on their "client device" (such as computer, tablet, or smart phone).[10]

43.     *TheHill.com* is hosted by a computer "server" that holds the website's contents and allows Defendant to exchange communications with its digital subscribers via their client devices and web browsers.

44.     These communications consist of HTTP Requests and HTTP Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies.

45.     An HTTP request is simply an electronic communication that the digital subscriber's browser sends to the *TheHill.com* server when the digital subscriber clicks on a link to a news article or video. In addition to specifying the particular URL (i.e., web address), HTTP requests can also transmit other types of data and cookies. Cookies are small text files that can be used to store information on a client device which can later be communicated to a server or servers.

46.     A digital subscriber's HTTP Request essentially asks *TheHill.com* to retrieve specific information (such as a particular article or video), and the HTTP Response sends the

---

[10] The most common web browsers are Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser.

requested information in the form of "markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the digital subscriber's screen as they navigate *TheHill.com*.

47.     In addition to markup, *TheHill.com* is comprised of source code, which is an invisible set of instructions that commands its digital subscribers' web browsers to undertake certain actions when the webpage loads or when a specified event triggers the code.

48.     Defendant embedded the Pixel in *TheHill.com's* source code, which in turn commanded its digital subscribers' web browsers to transmit data—including Personal Viewing Information—to Facebook in the form of HTTP Requests. Importantly, this process is invisible to ordinary consumers, thereby allowing Defendant to transmit  its digital subscribers' Personal Viewing Information without their knowledge.

49.     Third parties, like Facebook, place third-party cookies in the web browsers of users logged into their services.  These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third-party can uniquely identify the digital subscriber associated with the Personal Information intercepted.

50.     Additionally, Facebook's Conversions API tool works in conjunction with the Pixel and causes a second data transmission that is sent to Facebook directly from *TheHill.com's* server. Conversions API does not rely on web browsers, and this allows digital subscribers' Personal Viewing Information to be disclosed to Facebook even when their browser is configured to block third-party tracking tools.

51.     Conversions API "is designed to create a direct connection between [Web hosts'] marketing data and [Facebook]."  Thus, digital subscribers' Personal Viewing Information is received by Defendant and stored on *TheHill.com's* server before it is sent to Facebook via

Conversions API. Notably, client devices do not have access to host servers and thus cannot prevent (or even detect) this transmission.

52.    While there is no way to confirm with certainty that Defendant has implemented Conversions API without access to *TheHill.com* host server, Facebook instructs advertisers to "[u]se the Conversions API in addition to the [] Pixel, and share the same events using both tools," because such a "redundant event setup" allows Defendant "to share website events [with Facebook] that the pixel may lose."[11]  Thus, it is reasonable to infer that entities using the Facebook Pixel in accordance with Facebook's documentation will also implement the Conversions API tool.

### 3.    Facebook ID ("FID")

53.    An FID is a unique and persistent identifier that Facebook assigns to each user. With it, any ordinary person can look up the user's Facebook profile and name. When a Facebook user with one or more personally identifiable FID cookies on his or her browser views Video Media from *The Hill* on the website or app, *The Hill*, through its website code, causes the digital subscriber's identity and viewed Video Media to be transmitted to Facebook by the user's browser. This transmission is not the digital subscriber's decision, but results from Defendant's purposeful use of its Facebook tracking pixel by incorporation of that pixel and code into *The Hill's* website or App. Defendant could easily program the website and app so that this information is not automatically transmitted to Facebook when a subscriber views Video Media. However, it is not Defendant's financial interest to do so because it benefits financially by providing this highly sought-after information.

---

[11] *See* https://www.facebook.com/business/help/308855623839366?id=818859032317965 (last accessed February 20, 2023).

54.     Notably, while Facebook can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Facebook admits as much on its website. Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile. Simply put, with only an FID and the video content name and URL—all of which Defendant knowingly and readily provides to Facebook without any consent from the digital subscribers—any ordinary person could learn the identity of the digital subscriber and the specific video or media content they requested on *The Hill* website.

55.     At all relevant times, Defendant knew that the Facebook pixel disclosed Personal Viewing Information to Facebook. This was evidenced from, among other things, the functionality of the pixel, including that it enabled *The Hill's* website and app to show targeted advertising to its digital subscriber's based on the products those digital subscribers had previously viewed on the website or app, including Video Media purchases, for which Defendant received financial remuneration.

**E.     *The Hill* Unlawfully Discloses Its Digital Subscribers' Personal Viewing Information to Facebook**

56.     Defendant utilizes Facebook's Business Tools and intentionally installed the Pixel and Conversions API on its website to track and transmit their Personal Viewing Information to third parties.

57.     Defendant's webpages contain a unique identifier which indicates that its Pixel was used on a particular webpage (represented as "id=1753508728076333" in the relevant lines of code).

58.     The data and viewing information Facebook received was sent alongside Plaintiff's and Class Members' Facebook ID (c_user cookie or "FID"), thereby allowing a digital subscriber's

viewing information to be linked and attributed to their Facebook accounts and attributed to them personally.[12]

59.     Defendant deprived Plaintiff and Class Members of their privacy rights when it implemented technology (i.e., the Facebook Pixel and Conversions API) that disclosed its digital subscribers' Personal Viewing Information to Facebook without obtaining their consent in a manner that meets the VPPA's statutory requirement.

60.     When a digital subscriber views videos on *TheHill.com*, they may do so by using the search bar or clicking on a link from within the homepage or another webpage. For instance, as shown in the screenshot below, a user visits *The Hill* website and clicks on an article titled "Journalist Zaid Jilani warns media against 'COVID-19 grave dancing'" and watches the video in the article.



*Pictured above: The article titled "Journalist Zaid Jilani warns media against 'COVID-19 grave dancing"
(taken from The Hill website on or about August 19, 2021).*

61.

---

[12] Defendant's Website track and transmit data via first-party and third-party cookies. The c_user cookie or FID is a type of third-party cookie assigned to each person who has a Facebook account, and it is comprised by a unique and persistent set of numbers.

62.     Unbeknownst to the digital subscriber, information concerning each and every video they view or request via *TheHill.com* is sent to Facebook via Defendant's Pixel, and the images below confirm that this data includes their Personal Viewing Information.

63.     The image below is a screenshot that was taken while using developer and inspection tools prior to Defendant's removal of the Pixel.



```
METHOD: GET +

URL

+ https://www.facebook.com/tr/?id=1753508728076333&ev=K
WVID&dl=https%3A%2F%2Fthehill.com%2Fhilltv%2Frising%2F56
8763-journalist-zaid-jilani-warns-media-against-covid-19
-grave-dancing&rl=https%3A%2F%2Fthehill.com%2Fhilltv&if=
false&ts=1629632773255&cd[vEvent]=videoProgress&cd[posit
ion]=15.18845&cd[positionDesc]=15sec&sw=1536&sh=864&v=2.
9.44&r=stable&ec=10&o=30&fbp=fb.1.1629632720602.17539321
13&it=1629632723824&coo=false&dpo=LDU&dpoco=0&dpost=0&tm
=2&rqm=GET

HEADERS

+ accept:              image/avif,image/webp,image/apng,imag
                       e/svg+xml,image/*,*/*;q=0.8
+ accept-             gzip, deflate, br
  encoding:
+ accept-             en-US,en;q=0.9
  language:
+ connection:         keep-alive
+ cookie:             sb=QSYiYalyDwjYI6rQNkC3a1mk;
                      datr=QSYiYVC85DiamULjOSfxaqg8;
                      dpr=1.25; c_user=11███████
                      spin=r.1004289/19_b.trunk_t.162962804
                      4_s.1_v.2_;
                      xs=48%3A3FkHDBcXoLJ1Tg%3A2%3A16296280
                      21%3A-
                      1%3A15160%3A3AAcXXzVWgrYBt_uvziFGqMr
                      tM8z_HOM-JB6wRAONlGA;
                      fr=1So81N3XiySO0qSy8.AWWaqOIEqa49fm2S
                      eSkx3JJ_Wx4.BhIjSO.QD.GEi.0.0.BhIjSO.
                      ;
                      presence=EDvF3EtimeF1629632281EuserFA
                      21175294866A2EstateFDutF0CEchF_7bCC
+ host:               www.facebook.com
```

*HTTP single communication session sent from the device to Facebook, reveals the video name, URL and the viewer's FID (c_user field)*

64.     As a result of Defendant's data compiling and sharing practices, Defendant has knowingly disclosed to Facebook for its own personal profit the Personal Viewing Information of Defendant's digital subscribers, together with additional sensitive personal information.

65.     The first line of highlighted text, "id=1753508728076333," refers to the Defendant's Pixel ID for this particular webpage and confirms the Defendant downloaded the Pixel into its source code.

66.     The second line of text, "ev: PageView," identifies and categorizes which actions the user took on the webpage ("ev:" is an abbreviation for event, and "PageView" is the type of event). Thus, this identifies the user as having viewed the particular webpage and video.

67.     The remaining lines of text: (1) identify the digital subscriber as having viewed or requested specific video content ("journalize-zaid-hilani-warns-media-against-covid-19-grave-dancing"); (2) reveal the title of they viewed or requested from Defendant; and (3) reveal the digital subscriber's identity (represented as "c_user" and partially redacted in the image above).[13]

68.     In addition to tracking its digital subscribers' "PageViews," Defendant's Pixel also transmitted information about which buttons digital subscribers clicked or selected during their browsing session (such as hyperlinks to the physician's phone number or physical address). In these instances, Defendant's Pixel may have categorized digital subscribers' webpage activity as "Microdata" or a "SubscribedButtonClick" prior to sending it to Facebook.

69.     Resultingly, Defendant breached Plaintiff's and Class Members' right to privacy by unlawfully disclosing their Private Viewing Information to Facebook without their consent.

---

[13] Plaintiff highlighted the first portion of the c_user ID and redacted the remainder of the corresponding string of numbers to preserve the user's anonymity.

70.     Plaintiff values his privacy, and Plaintiff and Class Members were harmed by Defendant's unlawful conduct and violation of their privacy rights.

71.     Plaintiff has a continuing interesting in ensuring that future videos he views in conjunction with his digital subscription to *thehill.com* are protected and safeguarded from future unauthorized disclosures to third parties, including but not limited to disclosures made to Facebook via the Pixel, Conversions API, or any other tool which allows him to be identified.

**F.     Disclosing Personal Viewing Information is Not Necessary.**

72.     Tracking pixels is not necessary for Defendant to operate *The Hill's* digital news publications and sign-up digital subscriptions. They are deployed on Defendant's website for the sole purpose of enriching Defendant and enabling them to retarget[14] its digital subscribers.

73.     In exchange for disclosing its digital subscribers' Personal Viewing Information, Defendant was compensated by Facebook in the form of enhanced advertising services and more cost-efficient marketing on Facebook.

74.     By utilizing the Pixel, the cost of advertising and retargeting was reduced, thereby benefitting Defendant.

75.     Even if an on-line news publication found it useful to integrate Facebook tracking pixels, Defendant is not required to disclose Personal Viewing Information to Facebook. In any event, if Defendant wanted to do so, it must first comply with the strict requirements of VPPA, which it failed to do. As noted above, even Facebook forbids the disclosure of such information without first complying specifically with the VPPA (and relevant state laws).

---

[14] Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Defendant re-targeted digital subscribers and potential digital subscribers.

### G.      Plaintiff's Experiences

76.      Plaintiff Allin Frawley has been a digital subscriber of *The Hill* from 2019 to the present. Plaintiff became a digital subscriber of *The Hill* by providing, among other information, his name, address, email address, IP address (which informs Defendant as to the city and zip code he resides in as well as his physical location), and any cookies associated with his device. As part of his subscription, he receives emails and other news from *The Hill*.

77.      Plaintiff has had a Facebook account since approximately 2010. From 2019 to the present, Plaintiff viewed Video Media via *The Hill*'s website and App.

78.      Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Personal Viewing Information to Facebook. Plaintiff has never been provided any written notice that Defendant discloses its digital subscribers' Personal Viewing Information, or any means of opting out of such disclosures of his Personal Viewing Information. Defendant nonetheless knowingly disclosed Plaintiff's Personal Viewing Information to Facebook.

79.      Because Plaintiff is entitled by law to privacy in his Personal Viewing Information, Defendant's disclosure of his Personal Viewing Information deprived Plaintiff of the full set of benefits to which he was entitled as part of being a *The Hill* digital subscriber. Plaintiff did not discover that Defendant disclosed his Personal Viewing Information to Facebook until November 2022.

### V.      CLASS ACTION ALLEGATIONS

80.      Plaintiff brings this action on behalf of himself and all others similarly situated as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

> All persons in the United States with a digital subscription to an online website owned and/or operated by Defendant that had their Personal Viewing Information disclosed to Facebook by Defendant.

81.     Excluded from the Class are Defendant, their past or current officers, directors, affiliates, legal representatives, predecessors, successors, assigns and any entity in which any of them have a controlling interest, as well as all judicial officers assigned to this case as defined in 28 USC § 455(b) and their immediate families.

82.     <u>Numerosity</u>. Members of the Class are so numerous and geographically dispersed that joinder of all members of the Class is impracticable. Plaintiff believes that there are hundreds of thousands of members of the Class widely dispersed throughout the United States. Class members can be identified from Defendant's records and non-party Facebook's records.

83.     <u>Typicality</u>. Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and members of the Class were harmed by the same wrongful conduct by Defendant in that Defendant caused Personal Viewing Information to be disclosed to Facebook without obtaining express written consent. His claims are based on the same legal theories as the claims of other Class members.

84.     <u>Adequacy</u>. Plaintiff will fairly and adequately protect and represent the interests of the members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class. Plaintiff is represented by counsel with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically.

85.     <u>Commonality</u>. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include:

(a)     Whether Defendant knowingly disclosed Class members' Personal Viewing Information to Facebook;

(b)     Whether the information disclosed to Facebook concerning Class members' Personal Viewing Information constitutes personally identifiable information under the VPPA;

(c)     Whether Defendant's disclosure of Class members' Personal Viewing Information to Facebook was knowing under the VPPA;

(d)     Whether Class members consented to Defendant's disclosure of their Personal Viewing Information to Facebook in the manner required by 18 U.S.C. § 2710(b)(2)(B); and

(e)     Whether the Class is entitled to damages as a result of Defendant's conduct.

86.     <u>Superiority</u>. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## VI.    CLAIM FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710**

87.    Plaintiff incorporates the preceding paragraphs by reference as if fully set forth herein.

88.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C § 2710.

89.    As defined in 18 U.S.C. §2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."

90.    Defendant is a "video tape service provider" as defined in 18 U.S.C. §2710(a)(4) because it engaged in the business of delivering audiovisual materials that are similar to prerecorded video cassette tapes and those sales affect interstate or foreign commerce.

91.    As defined in 18 U.S.C. §2710(a)(3), "personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

92.    Defendant knowingly caused Personal Viewing Information, including FIDs, concerning Plaintiff and Class members to be disclosed to Facebook. This information constitutes personally identifiable information under 18 U.S.C. §2710(a)(3) because it identified each Plaintiff and Class member to Facebook as an individual who viewed *The Hill* Video Media, including the specific video materials requested from the website.

93.     As defined in 18 U.S.C. §2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged in the preceding paragraphs, Plaintiff subscribed to a digital *The Hill* plan that provides Video Media content to the digital subscriber's desktop, tablet, and mobile device. Plaintiff is thus a "consumer" under this definition.

94.     As set forth in 18 U.S.C. §27109(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner." Defendant failed to obtain informed, written consent under this definition.

95.     In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendant failed to provide an opportunity to opt out as required by the VPPA.

96.     Defendant knew that these disclosures identified Plaintiff and Class members to Facebook. Defendant also knew that Plaintiff's and Class members' Personal Viewing Information was disclosed to Facebook because, *inter alia*, Defendant chose, programmed, and intended for Facebook to receive the video content name, its URL, and, most notably, the digital subscribers' FID.

97.     By disclosing Plaintiff's and the Class's Personal Viewing Information, Defendant violated Plaintiff's and the Class members' statutorily protected right to privacy in their video-watching habits. *See* 18 U.S.C. § 2710(c).

98.     As a result of the above violations, Defendant is liable to the Plaintiff and other Class members for actual damages related to their loss of privacy in an amount to be determined at trial or alternatively for "liquidated damages not less than $2,500 per plaintiff." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

## VII.     RELIEF REQUESTED

99.     Accordingly, Plaintiff, on behalf of himself and the proposed Class, respectfully requests that this Court:

(a)     Determine that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declare Plaintiff as the representative of the Class;

(b)     For an order declaring that Defendant's conduct as described herein violates the federal VPPA, 18 U.S.C. § 2710(c)(2)(D);

(c)     For Defendant to pay $2,500.00 to Plaintiff and each Class member, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(d)     For punitive damages, as warranted, in an amount to be determined at trial, 18 U.S.C. § 2710(c)(2)(B);

(e)     For prejudgment interest on all amounts awarded;

(f)     For an order of restitution and all other forms of equitable monetary relief;

24

(g)     For injunctive relief as pleaded or as the Court may deem proper; and

(h)     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit, 18 U.S.C. § 2710(c)(2)(C).

## VIII.   JURY DEMAND

100.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of himself and the proposed Class, demands a trial by jury on all issues so triable.

Dated: February 20, 2023                          Respectfully submitted,

                                                                  /s/ Jonathan M. Jagher

                                                  Jonathan M. Jagher
                                                  **FREED KANNER LONDON & MILLEN LLC**
                                                  923 Fayette Street
                                                  Conshohocken, Pennsylvania 19428
                                                  Telephone: (610) 234-6487
                                                  Facsimile: (224) 632-4521
                                                  jjagher@fklmlaw.com

                                                  Gary M. Klinger*
                                                  **MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
                                                  227 W. Monroe Street, Suite 2100
                                                  Chicago, Illinois 60606
                                                  Telephone: (847) 208-4585
                                                  gklinger@milberg.com

                                                  Katrina Carroll*
                                                  **LYNCH CARPENTER, LLP**
                                                  111 W. Washington Street, Suite 1240
                                                  Chicago, Illinois 60602
                                                  Telephone: (312) 750-1265
                                                  katrina@lcllp.com

                                                  *Pro Hac Vice Forthcoming*